37 A.3d 509

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT, v. H.P., DEFENDANT–APPELLANT, AND V.P., DEFENDANT.

IN THE MATTER OF H.P., JR., A.P., AND A.P., MINORS.

Superior Court of New Jersey
Appellate Division

Argued September 13, 2011—Decided October 27, 2011.

Before Judges CARCHMAN, FISHER and BAXTER.

*Mary Potter,* Designated Counsel, argued the cause for appellant (*Joseph E. Krakora,* Public Defender, attorney; *Ms. Potter,* on the brief).

*James P. Gentile,* Deputy Attorney General, argued the cause for respondent (*Paula T. Dow,* Attorney General, attorney; *Lewis A. Scheindlin,* Assistant Attorney General, of counsel; *Mr. Gentile,* on the brief).

*Sonia G. Wagner,* Assistant Deputy Public Defender, argued the cause for the minors (*Joseph E. Krakora,* Public Defender, Law Guardian, attorney; *Ms. Wagner,* on the brief).

The opinion of the court was delivered by

FISHER, J.A.D.

In this appeal, defendant H.P. argues, among other things, that an order declaring he abused or neglected his three children cannot stand because it was based on testimony heard by the court when defendant was not represented by counsel and because the judge utilized the "clear and convincing" instead of "preponderance" standard. We agree that the utilization of the clear and convincing standard was improper absent prior notice. And, although it might logically follow that the judge would have concluded that abuse or neglect was demonstrated by the lesser standard, his findings are insufficient to permit any safe conclusion. Accordingly, we vacate the order under review and remand for further proceedings.

The record on appeal reveals that H.P. has been married to defendant V.P. for many years. On December 5, 2008, when the events in question were set in motion, the couple's three children were eleven, eight and seven years old. On that day, the children were removed from the home by the Division of Youth and Family Services (the Division) and placed in separate foster homes,[1] based upon a referral of a domestic violence incident that occurred a week earlier.

The complaint, which invoked Title Nine, *N.J.S.A.* 9:6–8.21, was filed on December 9, 2008. The complaint recounted that the oldest child, A.P. (hereafter "Alice," a fictitious name), reported to school officials on Monday, December 1, 2008, that on Thanksgiving Day[2] her father, defendant H.P. (hereafter "defendant"[3]), had

---

[1] The two older children, both girls, were placed in one foster home; their younger brother was placed in another.

[2] Thanksgiving Day was November 27, 2008.

"been drinking" and "tried to kill her mother" by "chok[ing]" her and "bang[ing] her head against the wall." According to the complaint, Alice called 9-1-1, and police officers arrived and arrested her father. The referral to the Division was not made by the school until December 5, 2008.

On December 9, 2008, the day the complaint was filed, the trial court conducted a hearing regarding the legitimacy of the children's removal. The record reflects that all parties—except defendant—were represented by counsel at that hearing. An attorney from the Office of Parental Representation (OPR) representing defendant's wife, V.P., informed the court he "had advised [defendant] to remain silent at this point."

There is nothing in the record to suggest that anyone advised defendant of his right to counsel or how he could apply for representation through OPR. Instead, the judge simply commenced the hearing. Counsel for the Division provided an opening statement and then called a Division caseworker, who provided an account of the circumstances alleged in the complaint, that prompted the Division to remove the children. For the most part, the caseworker simply reported the content of the referral and the statements Alice had made to him and others about her father's conduct on Thanksgiving.

The caseworker also testified that he spoke with the younger children and recounted that the second oldest child, Anna (a fictitious name), told him that her father "would yell at her and beat her" with a belt; she also testified that the youngest child, H.P., Jr. (hereafter "Harold," also a fictitious name), stated "that his father would beat him with a belt . . . every night" and that,

---

[3] Although the children's mother was named as a defendant, the Division's theory changed and, early in the litigation, the Division took the position that she had not abused or neglected the children but instead was the victim of defendant's conduct on Thanksgiving. Any abuse or neglect the Division sought to attribute to the children's mother resulted from her continued relationship with defendant.

"[e]very weekend," his father "called his sisters fat pigs ... and called him gay homo."

The caseworker testified that he visited the family home. At that time, both defendant and his wife were present. He spoke with defendant's wife, who said defendant "drinks excessively," and that, on the day in question, he was intoxicated and "a little bit out of control." She denied, however, that defendant "had threatened the children." Other than these generalities, the caseworker provided no other statements he received from defendant's wife regarding the incident; if he spoke with defendant during the course of his investigation, he was not asked at the hearing to reveal the content of those discussions.

The caseworker was cross-examined by counsel for defendant's wife and the Law Guardian. Among other things, it was revealed during cross-examination that there were prior allegations of domestic violence regarding defendant and his wife but none during the previous eight years. According to the transcript, the judge did not offer defendant the opportunity to cross-examine the witness. With that, the Division rested.

Defendant's wife was then called as a witness by her attorney and provided the following testimony:

Q. ... Was there an incident ... occurring on Thanksgiving?

A. No. This—there was an incident like a week later or the following weekend, but there was no choking, there was no head-banging.

. . . .

Q. Was there a physical altercation?

A. No. It was more grabbing. He started getting a little out of control, but it wasn't nothing—nothing to call 911 about.

Q. Was 911 called?

A. Yeah. My daughter ... hid in the room and called 911. I didn't even know she called 911 until [the police] got there.

. . . .

Q. So on that occasion, you did not flee to Lindenwold?

A. I fled to Lindenwold after he got arrested, which he got arrested for a traffic warrant. . . . A warrant for not going to court. It had nothing to do with domestic violence.

. . . .

Q. So there was no ambulance involved—

A. No.

Q. —no injury.

A. No choke marks, no nothing. No.

Q. So a police report would indicate—

A. Yes.

Q. —that he was arrested for—

A. For violating—for motor vehicle—what was it?—for driving while suspended—I don't know—something with motor vehicle.

Defendant's wife also testified that after the Division caseworker stated that the children were going to be removed, she told him she would separate from defendant because she was willing "to do whatever it takes . . . to get my kids back."

In addition, defendant's wife testified about the two younger children's allegations of defendant's abuse of them. She rejected Harold's claim of daily abuse or that the child had been struck with a belt:

Q. . . . You agree, however that [Harold] has been disciplined with a belt at [defendant's] hands. Is that correct?

A. Mainly his hands, not a belt.

Q. Okay. But you're agreeing that he has, at least on one instance, been disciplined with a belt. That was your testimony—

A. Threatened with a belt, but he's never beat him with a belt. He's always smacked him with his hands, never a belt.

Q. So there's a distinction in your mind between threatening a child who is seven years old with a belt and actually beating him. Is that correct?

A. Yes.

As for the incident that happened either on Thanksgiving (according to Alice) or two days later (according to defendant's wife), defendant's wife provided the following account during cross-examination:

Q. And the incident that occurred was precisely what?

A. He was grabbing my chest and—he was just out of control drinking. And me and my girlfriend tried to calm him down.

Q. As he was grabbing your chest or breasts, what was he saying to you?

A. He called me a fat pig.

. . . .

Q. And I believe your testimony was he grabbed your chest.

A. Yes.

Q. Did you perceive that act in which he grabbed your chest as being a threatening or assaultive act?

A. Yes.

. . . .

Q. I presume you left and went outside because you feared for your safety.

A. Yes.

Defendant's wife adamantly stated that she had determined to live separate from and not reconcile with defendant, but her testimony suggested that the spectre of losing her children as a result of remaining with defendant was a strong motivating factor in making this choice.

Defendant's wife was cross-examined by counsel; the judge also questioned her. According to the transcript, the judge did not give defendant an opportunity to cross-examine his wife. Instead, after defendant's wife had stepped down from the witness stand, the following occurred:

[DEFENDANT]: Your Honor?

THE COURT: Yes?

[DEFENDANT]: Can I make a statement?

[DEPUTY ATTORNEY GENERAL]: Your Honor, if he's going to—

THE COURT: Well, you've been advised to and—

[DEFENDANT]: I know. I—

THE COURT: I'll repeat the advice that—

[DEFENDANT]: Yeah. I'm not—

THE COURT: —the best thing that you can do is say is nothing.

[DEFENDANT]: I'm not worried about that, though, as far as you guys use it against me. You know, I understand.

[DEPUTY ATTORNEY GENERAL]: Your Honor, he has to be sworn.

[LAW GUARDIAN]: Your Honor, I'd ask that he be sworn—

THE COURT: You have to take the witness stand.

[LAW GUARDIAN]: —and take the witness stand.

[DEFENDANT]: Okay.

Before anything else occurred along these lines, counsel for defendant's wife interrupted to remind the court that he had not concluded his case.

Permitted to proceed, the attorney called as a witness a friend of defendant's wife who witnessed the event in question. Before the witness could testify, however, counsel stipulated—although there is nothing in the record to suggest that defendant consented to the stipulation—that the friend's description of the event would be the same as defendant's wife. Other than some other brief testimony from that witness not presently relevant, counsel for defendant's wife rested.

Once counsel rested, defendant again sought the right to testify. The judge reminded defendant that he had "been advised by both the [c]ourt and [defendant's wife's attorney] not to testify," and that if he testified he would be subject to cross-examination. Defendant replied he did not care and understood that the testimony "could be used against [him], not only in this case but in any criminal charges that might arise" and that he was "willing to expose [him]self to criminal prosecution" "[w]ithout having an attorney present" and "[a]gainst everyone's advice." Satisfied that defendant knew what he was doing, the judge permitted him to be sworn and testify.

In his brief testimony, defendant asserted his concern for the children, that he did not "want to see the kids in foster homes," and that he would leave the home and stay away from his wife and children in order to avoid that circumstance; he explained that the situation

> [is] tearing me up, but it's a lot harder on [my wife]. You know, we're not perfect as a couple and, yeah, we do have problems. It's not to the extent that's, you know, in the report. It's not even close to that, but ... you know, all I'm asking ... just let the kids be with her. I mean, at this point, she can have the house.... It doesn't make a difference to me. I'm just concerned about the children. You know, it doesn't matter I won't have contact with her. Whatever DYFS—whatever you guys want me to do. I don't care. I'll do it. As far as whatever classes, counseling, I don't care. You name it, I'll do it. Just let her have the kids. That's all I'm asking.

Defendant said nothing further and no one cross-examined.

After hearing counsel's argument, including defendant's statement that his closing would be the same as his testimony, the judge concluded in an oral decision that the removal was appropri-

ate and continued the status quo with a direction that the parties follow the Division's recommendations. He refused to allow the children to be returned to their mother's sole custody even if she were to reside in her friend's house. And he barred defendant from having any contact with the children.

The children did not fare well in foster care. Anna threatened to commit suicide with a kitchen knife and was hospitalized in a psychiatric ward on December 12, 2008. Seven-year old Harold's apparent stress required that he wear a diaper. The children were moved at least three times in eleven months. On March 18, 2009, when the parties were before the court for the fourth time in this case—but, finally, the first time defendant was represented by counsel—even the Division's counsel admitted the Division had not "provided meaningful services till this point" and that what the Division

ha[s] done is almost as inexcusable as what the parents have done to these children. And I stand before the [c]ourt on the Division's failure, both professionally and personally embarrassed.

Notwithstanding this extraordinary concession, the Division continued to argue in favor of the status quo. The Division and the Law Guardian expressed their great concern about the fact that defendant had managed to speak with Harold by telephone in violation of the judge's prior orders. Quickly shunting aside the Division's own failures, the Division's counsel referred to this event as exhibiting, on the part of both defendants, "a frightening lack of empathy for the pain which these children have suffered." The Law Guardian concurred, advising the court she was "simply appalled" upon learning of the contact between defendant and Harold.

A hearing regarding whether either defendant or his wife had abused or neglected the children was ultimately scheduled for May 11, 2009, six months after removal. At that time, the Division advised it was not seeking a finding against defendant's wife, claiming she was a victim of domestic violence and had not abused or neglected the children. Consequently, defendant's wife

was only asked to stipulate that her family was "in need of services."

The Division then proposed submitting the issue of whether defendant had abused or neglected the children to the judge by providing him with a recording of the testimony heard on December 9, 2008, followed at a later time by counsel's oral summations. In response, defendant's counsel said:

> I have no objection to proceeding in the manner outlined by the Division, Judge. I'll be prepared to close at the time the Judge—the Court would set a court date. I've had a chance to review the tapes, I've got a copy of the tapes and I'm okay with the proceeding in that fashion.

All others agreed and the date for closings was set for June 22, 2009.

At the start of the proceedings on June 22, 2009, the judge placed on the record his understanding that counsel had waived closings. Counsel agreed that was true. The judge then rendered an oral decision in which he concluded that—by clear and convincing evidence—the children were abused or neglected within the meaning of *N.J.S.A.* 9:6–8.21(c). An order memorializing that determination was entered on June 25, 2009.

Counseling and other services continued to be provided to the family and a consent order was entered on November 17, 2009, returning the children to the care and custody of both parents, who had since reconciled. The Division maintained care and supervision over the children in order to ensure they remained safe following their return home. On August 3, 2010, the court entered an order terminating the action.

Defendant thereafter filed an appeal, seeking our review of the June 25, 2009 order, and presenting the following arguments for our consideration:

> I. THE FACT–FINDING ORDER MUST BE REVERSED AS IT IS BASED ON THE WRONG STANDARD OF PROOF AND IS NOT SUPPORTED BY SUBSTANTIAL CREDIBLE EVIDENCE IN THE RECORD.
>
> A. The Governing Statute Permits a Finding by the Preponderance of the Evidence Standard Only. (Not Raised Below)

B. The Lack of Competent Evidence of Impairment Of the Children's Physical, Mental or Emotional Condition Requires Reversal Of the Fact-finding Order.

II. THE FINDINGS OF FACT MUST BE REVERSED AS THE FATHER DID NOT MAKE A VALID WAIVER OF HIS CONSTITUTIONAL AND STATUTORY RIGHT TO COUNSEL NOR HIS RIGHT TO A FULL AND FAIR FACT-FINDING HEARING. (Not Raised Below)

A. Just As in Criminal Proceedings, A Parent Facing The Temporary or Permanent Loss of His Children Possesses Both a Statutory and a Constitutional Right to Counsel.

B. Because the Trial Court Failed In Its Obligation to Ascertain Whether the Father's Waiver of Counsel and a Full Fact-Finding Hearing Was Knowingly and Intelligently Made, the Fact-Finding Order Must be Reversed.

Because we find the trial judge's findings of fact are inadequate to support a determination that defendant abused or neglected any of the children, we remand for further proceedings. Before setting forth our reasons for that conclusion, we first turn to two procedural problems, namely: the desultory way in which defendant's right to counsel was treated at the early stages of this case, and the judge's unilateral decision to make his findings of abuse and neglect through application of the clear and convincing standard of proof.

I

As mentioned earlier, when the parties were present in court on December 9, 2008—for an adjudication of the propriety of the emergent removal of the children—defendant was without counsel. The trial court did not advise defendant of his right to counsel and the matter proceeded as if that fact were irrelevant. The Division has claimed there is no authority to support defendant's claim to the right to counsel at the removal hearing; that contention is untenable and contrary to the clear import of Title Nine and our jurisprudence. *See N.J. Div. of Youth & Family Servs. v. E.B.*, 137 *N.J.* 180, 186, 644 *A.*2d 1093 (1994); *N.J. Div. of Youth & Family Servs. v. B.H.*, 391 *N.J.Super.* 322, 344, 918 *A.*2d 63 (App.Div.), *certif. denied*, 192 *N.J.* 296, 927 *A.*2d 1294 (2007). Indeed, the right to counsel in this setting is of constitutional dimension, and so important that the Legislature—anticipating the likelihood that a defendant may be unable to secure

counsel on such short notice—provided defendants in such actions with the following rights:

> The court shall advise the parent or guardian of his right to have an adjournment to retain counsel and consult with him. The court shall advise the respondent that if he is indigent, he may apply for an attorney through the Office of the Public Defender. In cases where the parent or guardian applies for an attorney through the Office of the Public Defender, the court may adjourn the case for a reasonable period of time for the parent or guardian to secure counsel; however, the adjournment shall not preclude the court from granting temporary relief as appropriate under the law.
>
> [N.J.S.A. 9:6–8.43(a).]

The trial judge did not advise defendant of his right to counsel, did not advise defendant of his right to have counsel appointed for him if he was indigent, and did not advise defendant of his right to have an adjournment in order to obtain counsel. The proceedings that occurred on that occasion were fatally deficient for these reasons.[4]

■ Yet, the Division is correct that the deficient manner in which the matter proceeded on December 9, 2008, is no longer of any relevance. Defendant has appealed only the order of June 25, 2009, which memorialized the later finding of abuse and neglect. Although it is true that the evidence considered by the judge on that later occasion was produced at the earlier hearing, when defendant was unrepresented and not advised of the rights enumerated in N.J.S.A. 9:6–8.43(a), his consent to the manner in which the later fact finding occurred was rendered with the advice of counsel. That is, defendant waived any right to complain of the manner in which the finding was made because that waiver was rendered when he was represented by counsel. Because defendant does not argue that his consent to the utilization of the

---

[4] A few days before oral argument in this court, defendant's appellate counsel moved to supplement the record with her own certification containing her assertion that Family judges in a number of vicinages routinely fail to heed N.J.S.A. 9:6–8.43(a). We will deny the motion by way of a separate order. If what counsel would present to us is true, then our opinion in this case will provide the guidance to the bench and bar defendant seeks without unduly expanding the record here with this anecdotal contention.

December 9 record was the product of the ineffective assistance of counsel, *see N.J. Div. of Youth & Family Servs. v. B.R.*, 192 *N.J.* 301, 929 *A.*2d 1034 (2007), we agree with the Division that the manner in which the record for the fact-finding hearing was created is no longer assailable.

Consequently, although defendant's right to counsel was not honored on December 9, 2008, his consent on May 11, 2009, to the manner in which the record was created, constituted a waiver of his right to complain of that earlier deprivation.

II

The tendency of Family judges in certain circumstances to make a finding in a Title Nine case through utilization of the clear and convincing standard applicable in Title Thirty cases is not unfamiliar. Although this "gratuitous lifting" of the standard of proof would appear to provide the defendant with the advantage of putting the Division to a higher test than required by Title Nine, use of the higher standard also had the potential to abbreviate the proofs in a later Title Thirty case. *N.J. Div. of Youth & Family Servs. v. R.D.*, 207 *N.J.* 88, 118, 23 *A.*3d 352 (2011). That is, with a finding of abuse or neglect in a Title Nine case using the higher standard, the Division may be relieved of the burden of proving the first prong of a Title Thirty case so long as it is otherwise appropriate to apply the doctrine of collateral estoppel in the later case. *Ibid.*

The Supreme Court recently considered this in *R.D.*, where the trial judge in the Title Nine case found abuse or neglect by clear and convincing evidence and, in the course of a later Title Thirty case, the Division argued that the defendant should be barred from contesting a finding that he committed abuse or neglect. The Court held that the doctrine of collateral estoppel could be successfully invoked in that circumstance only if three factors were presented. *Id.*, at 120–21, 23 *A.*3d 352. Of interest here is the first such factor, which requires that the Title Nine court "must provide advance notice to the parties that, if supported by

the proofs, it will make its findings using the higher Title Thirty 'clear and convincing evidence' standard." *Id.,* at 120, 23 *A.*3d 352. The record on appeal here contains no evidence that the trial judge ever advised defendant that the claim of abuse or neglect would be adjudicated through the use of the higher standard. For that reason, the judge's conclusion that the higher standard was satisfied can have no further force and effect.

The circumstances that the Court considered in *R.D.,* however, are not before us. No Title Thirty action was commenced; indeed, as we have observed, the family has been reunited, so the question of whether the abuse or neglect finding here may have collateral effect in later litigation has not yet and may never occur. What is relevant, however, is defendant's inclusion in the Central Registry, an event that is the result of the finding of abuse or neglect regardless of the standard utilized, that is of significant consequence. *See N.J. Div. of Youth & Family Servs. v. S.S.,* 372 *N.J.Super.* 13, 26–28, 855 *A.*2d 8 (App.Div.2004), *certif. denied,* 182 *N.J.* 426, 866 *A.*2d 983 (2005). Accordingly, although we agree with defendant that the judge erred in utilizing the higher standard of proof without advance notice, defendant has not been and may never be harmed by the consequences of that error. The harm to defendant does not change whether we consider the finding of abuse or neglect as having been achieved through the application of the clear and convincing standard or through the preponderance standard.

We, thus, turn to the question of whether the finding may stand because if the judge found there was clear and convincing evidence of abuse or neglect he undoubtedly would have reached that conclusion by a less strict burden of persuasion.

### III

Defendant argues that the evidence was insufficient to support a finding of abuse or neglect by the preponderance standard. The Division contends that if the judge, after his weighing of the evidence, determined that it met the clear and

convincing standard, he most assuredly would have held that it met the lesser preponderance standard. Certainly, that is a logical conclusion, but before we consider whether that prediction is accurate, we must first consider whether the judge correctly concluded that the evidence was sufficient to meet the higher standard.

The clear and convincing standard imposes a greater obstacle for the litigant saddled with the burden of persuasion than does the preponderance standard but less than that generated by the beyond a reasonable doubt standard. *Liberty Mut. Ins. Co. v. Land*, 186 *N.J.* 163, 169, 892 *A.2d* 1240 (2006). Clear and convincing evidence is that which produces in the mind of the factfinder "a firm belief or conviction as to the truth of the allegations sought to be established." *In re Purrazzella*, 134 *N.J.* 228, 240, 633 *A.2d* 507 (1993) (quoting *Aiello v. Knoll Golf Club*, 64 *N.J.Super.* 156, 162, 165 *A.2d* 531 (App.Div.1960)). That type of evidence must be "so clear, direct and weighty and convincing as to enable" the factfinder "to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Seaman*, 133 *N.J.* 67, 74, 627 *A.2d* 106 (1993) (quoting *In re Boardwalk Regency Casino License App.*, 180 *N.J.Super.* 324, 339, 434 *A.2d* 1111 (App.Div.1981), *modified*, 90 *N.J.* 361, 447 *A.2d* 1335, *appeal dismissed*, 459 *U.S.* 1081, 103 *S.Ct.* 562, 74 *L.Ed.2d* 927 (1982)).

We have quoted from the evidence adduced at the December 9, 2008 hearing. The Division's proofs consisted solely of the testimony of a caseworker, who provided information—mostly hearsay—gathered during his investigation. He provided statements that the children gave to him or statements given by the children to others that were subsequently provided to him. Neither the children nor the school officials testified. Alice's hearsay statements suggested that defendant attempted to kill their mother on Thanksgiving; the other children asserted that their father abused them through harsh and inappropriate language and beatings administered with a belt. Defendant's wife testified, howev-

er, that the children's stories were embellished. She testified that nothing happened on Thanksgiving, that defendant only grabbed her when intoxicated a few days after Thanksgiving, and that he may have once threatened the youngest child with a belt but any corporal punishment did not involve the use of a belt.

In his oral decision, the judge reviewed the procedural history of the case and the evidence adduced at the December 9, 2008 hearing. He recognized that the information provided by defendant's wife varied from the statements attributed to the children in the Division caseworker's testimony. He recounted the defendant's wife's version, in which she disputed Harold's claim that defendant beat him with a belt, denied defendant choked her, and acknowledged only that defendant "grabbed her chest and called her a fat pig." The judge also noted, and some of the testimony of defendant's wife would support the view, that she distanced herself from defendant after he grabbed her because "she feared for her safety." In addition, the judge discerned from this testimony that what he referred to as defendant's "assault on her" was "a traumatic event" for Alice to witness and that this circumstance "opened [the wife's] eyes" to defendant's control over her. The judge then described how,

> [a]t that point, she broke down and cried and she said that she waits every day for the abuse to occur. She said that she was almost always fearful and has wanted to escape, but has been unable for a long time to do so. She said that she does not have the strength to break free. She admitted that the abuse had continued for years, but vowed to remain separated from [defendant].

The judge also referred to defendant's testimony and his willingness to stay away from his wife and children in order to hasten the children's return to their mother. The judge observed that defendant "admitted fighting." However, the context in which defendant referred to their "fighting" did not preclude the possibility that defendant used that word in its broadest sense, i.e., that they "fought" about money or other issues, and not necessarily as a concession that he had physically attacked his wife on the date in question or any other time. Certainly, as the finder of fact, the judge could have interpreted defendant's admission of "fighting"

as connoting something physical, but the judge did not explain that that is what he had done. Instead, he accepted defendant's statement that there was "fighting" with his wife and that there were, in the past, "domestics,"[5] and drew the more serious connotation of those terms without explaining why.

After reviewing the various versions provided by the witnesses, the judge then invoked the language of *N.J.S.A.* 9:6–8.21(c), in concluding that defendant had abused or neglected the children. As to the two younger children, the judge concluded that defendant had impaired their physical, mental and emotional conditions "by unreasonably inflicting harm, by abusing them both verbally and by the infliction of excessive corporal punishment and by repeatedly exposing them to domestic violence by verbally and physically abusing their mother, his wife . . . in their presence." As to Alice, the oldest child, who made no claim of excessive corporal punishment, the judge held that her physical, mental and emotional conditions were impaired or in danger of being impaired as a result of defendant "unreasonably inflicting harm, by repeatedly exposing her to domestic violence, by verbally and physically abusing her mother, his wife, in her presence." The judge lastly concluded that these findings "are based on clear and convincing evidence which includes the admissions, both express and tacit, of the defendants." We find these findings insufficient for a number of reasons.

First, the only admission made by defendant—as noted above— was his acknowledgement that there was "fighting" and past "domestics." Any statements made by defendant's wife could not constitute defendant's admissions.

Second, the judge expressed no credibility findings. Indeed, he gave no opinion on what he actually found had occurred on the

---

[5] The use of the term "domestics" is particularly ambiguous because, in common parlance, it might not only encompass the occurrence of "domestic violence" but also the fact that police were called to the home as a result of some disturbance that might—or might not—constitute domestic violence.

date in question or any other time in the past. It is safe to assume that he found the children's versions to be credible because the two younger children were the ultimate source of any allegation that defendant had ever inflicted corporal punishment. Considering that their versions came from the testimony of the Division caseworker who was told what the children had claimed by a school official, it is difficult to view the Division's evidence as meeting the clear and convincing standard as that standard has been described by our Supreme Court.

Third, the judge made no finding as to how any of the alleged physical punishment supported a conclusion that defendant had meted out "excessive corporal punishment." The very phrasing of the applicable statute, which condemns only corporal punishment that is "excessive," demonstrates that other corporal punishment does not constitute abuse or neglect, as the Supreme Court later recognized. *See N.J. Div. of Youth & Family Servs. v. P.W.R.*, 205 *N.J.* 17, 35, 11 *A.*3d 844 (2011) (holding that "occasional" physical discipline "does not fit a common sense application of the statutory prohibition against 'excessive' corporal punishment"). The judge did not explain in his findings the nature of the corporal punishment and, thus, we are not satisfied that the judge's conclusion that any corporal punishment was excessive can be sustained.

Fourth, the judge found that some event, or multiple events, of domestic violence between defendant and his wife occurred in the presence of one or more of the three children and endangered them physically or emotionally. He did not, however, explain what the nature of the domestic violence was or how its occurrence in front of the children endangered them. *See S.S., supra,* 372 *N.J.Super.* at 25–26, 855 *A.*2d 8 (recognizing that witnessing domestic violence may cause emotional harm to a child but such a conclusion is not to be assumed absent proof from the Division of present or potential resulting harm).

In short, although we are obligated to defer to a Family judge's findings of fact, we do so only when satisfied those findings are supported by the evidence. The judge certainly could have found

from the evidence that Alice's version of what occurred was more likely than that described by her mother. He never, however, chose between those two versions or explained why he found Alice's version—particularly when Alice did not testify—more believable than the version provided by defendant's wife, who did testify in person. Moreover, even if the judge found Alice's version more believable, in light of the conflict in the versions recounted on December 8, 2008, and the fact that the person providing the more disturbing version did not testify, the judge's conclusion that the evidence of "repeated[ ] . . . domestic violence" in the nature of "verbal[ ] and physical[ ] abus[e]" was "clear and convincing" is not entitled to our deference. Our obligation to defer to findings supported by the evidence does not require that we simply rubberstamp those findings.

Beyond this, we also observe that the judge did not consider or discuss the potential motivation behind the testimony of defendant's wife. That is, the testimony of defendant's wife, some of which we quoted earlier, revealed her fervent desire to have the children returned to her. The Division's stated position at the time suggested she was unlikely to gain the Division's support for the return to her of the children unless she went along with the Division's view that she needed to rid herself of her husband. Because the record demonstrates little doubt that her primary motivation was the return of her children, it is conceivable that the accuracy of the facts recounted by her were thereby colored. The same can be said for defendant's brief testimony, when he clearly disavowed a desire to contest anything and expressed a willingness to do whatever it would take to have the children returned to his wife. The judge should have determined whether or to what extent the desires of defendant and his wife played a role in the statements they made, which the judge viewed as "admissions, both express and tacit."

We, of course, are mindful that the judge had the opportunity to see and hear these individuals testify and was in a better position to determine the truth of the matter. *Cesare v. Cesare,* 154 *N.J.*

394, 412, 713 *A.*2d 390 (1998). We have the right to expect, however, the rendering of findings that address these disputed issues and motivating factors. A judge's factfinding role is not satisfied by a summary of the testimony followed by a conclusory statement parroting the language of the applicable statute without credibility findings and an explanation as to how and why the ultimate conclusion was drawn.

■ In short, we have no hesitancy in concluding that the evidence adduced at the December 9, 2008 hearing was insufficient to allow the judge to draw the conclusion that the evidence of excessive corporal punishment or repeated verbal and physical domestic violence in the presence of the children was clear and convincing. The evidence adduced at that time could not have permitted the judge to conclude that "a firm belief or conviction as to the truth of the allegations sought to be established." *Purraz-zella, supra,* 134 *N.J.* at 240, 633 *A.*2d 507. And, although we do not reject the possibility that a judge could have found abuse or neglect by a preponderance of the evidence adduced on December 9, 2008, the questions about the record we have posed, which were not adequately explored in the judge's oral decision, counsel against an assumption that the judge would have drawn that conclusion had he more closely examined those concerns. Not every form of corporal punishment is "excessive," *P.W.R., supra,* 205 *N.J.* at 35–37, 11 *A.*3d 844 and not every unpleasant scene witnessed by a child causes emotional harm, *S.S., supra,* 372 *N.J.Super.* at 25–27, 855 *A.*2d 8. Because of the serious present and future consequences faced by defendant as a result of the Title Nine finding made here, *see id.,* at 26–28, 855 *A.*2d 8, we conclude that the interests of justice are better served by vacating the finding of abuse or neglect and remanding for a hearing on that question.

We lastly deem it appropriate—because the trial judge provided an opinion on the facts to which he may now feel committed—to direct that the remand proceedings be conducted by a different

judge. *See N.J. Div. of Youth & Family Servs. v. A.W.,* 103 *N.J.* 591, 617, 512 *A.*2d 438 (1986).

The order under review is vacated and the matter remanded for further proceedings in conformity with the letter and spirit of this opinion. We do not retain jurisdiction.