# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5787-14T3
                    A-5788-14T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

E.F. and F.F.,

    Defendants-Appellants.

_____

IN THE MATTER OF M.C.L., S.F.
and C.F., Minors.

_____

Submitted March 8, 2017 — Decided  May 10, 2017

Before Judges Fuentes, Simonelli and Gooden Brown.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FN-09-0359-11.

Joseph E. Krakora, Public Defender, attorney for appellant E.F (Dana Citron, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant F.F. (Fabiola Ruiz-Doolan, Designated Counsel, on the briefs).

Christopher S. Porrino, Attorney General, attorney for respondent (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Jonathan Villa, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Charles Ouslander, Designated Counsel, on the brief).

PER CURIAM

Defendants E.F.[1] (mother) and F.F. (father) appeal from the Family Part's October 17, 2011 order. Following a fact-finding hearing, the trial court determined that defendants abused and neglected their three children, M.C.L.,[2] a boy born in October 1994, C.F., a girl born in April 2003, and S.F., a girl born in August 2006. Specifically, the court found that defendants committed educational and environmental neglect and failed to maintain suitable housing within the meaning of N.J.S.A. 9:6-8.21(c)(4). The October 17, 2011 order became final on entry of an April 30, 2015 order terminating litigation following

---

[1] Pursuant to Rule 1:38-3(d)(12), we use initials to protect the confidentiality of the participants in these proceedings.

[2] F.F. is M.C.L.'s stepfather. M.L., M.C.L.'s biological father, was named as a defendant in the complaint for custody. However, no allegations of abuse or neglect were asserted against him and, after the removal, M.C.L. was placed in his care.

A-5787-14T3

reunification.[3] The matters are consolidated for this opinion. Based on our review of the record and the applicable legal principles, we affirm.

## I.

At the October 17, 2011 fact-finding hearing, the Division of Child Protection and Permanency (Division) presented the testimony of Mr. K., the principal of C.F.'s and S.F.'s school in New Jersey, and Lori Colon, a Division caseworker. Defendants, who are married, testified on their own behalf and produced their landlord, Mr. D., as a witness. Numerous documentary exhibits, including photographs, were also moved into evidence.

Mr. K. testified that during the first four months of the 2010-11 school-year, C.F.'s and S.F.'s teachers expressed concerns about the children attending school "with soiled and stained clothing" and un-brushed hair. The nurse also expressed concerns because there were "multiple cases of lice" reported. In addition, Mr. K. testified that C.F. had twenty-five unexcused absences and six unexcused late attendances. According to Mr. K., the children's excessive absences were referred to a truancy officer.

---

[3] M.C.L. was not returned to defendants' custody. Rather, following a dispositional hearing conducted pursuant to N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382 (2009), custody of M.C.L. was transferred to M.L. See N.J.S.A. 9:6-8.45; N.J.S.A. 9:6-8.47(a).

When Mr. K. tried to address these concerns with E.F. on a few occasions, she was unresponsive. On one occasion, when C.F.'s teacher tried to discuss her concerns at a back-to-school night, E.F. appeared "disoriented" and walked out of the room in the middle of the conversation. As a result, Mr. K. made two separate referrals to the Division. Sometime after Christmas, Mr. K. was advised that the family moved to New York. However, the school was never formally notified of the move and was never requested to forward the children's school records.

Colon testified that when the Division received the referral from the school in December of 2010, she went to the family's home in New Jersey on December 17, 2010. Upon arrival, Colon observed defendants getting into a vehicle. After identifying herself, Colon inquired about the children's whereabouts. Defendants advised her that the children were in South Jersey with relatives but could not provide an address or a contact number. Defendants told Colon that they were leaving New Jersey and moving to New York, and sped off. Colon was later contacted by the Administration for Children's Services (ACS), the child welfare agency in New York. ACS was investigating concerns regarding the children's education because they were not enrolled in school in New York. Once Colon provided ACS with the family's history in

New Jersey, the New Jersey case was closed and the allegations were determined to be unfounded.

On March 10, 2011, the Division received another referral involving the family alleging that they were living in deplorable conditions at the same address in New Jersey where Colon had previously encountered them. When Colon arrived at the home, E.F. refused to let her in, prompting Colon to contact the police for assistance. Once the police arrived, Colon was able to access the home and interview the children. According to Colon, the children appeared dirty and unkempt. Their hair appeared to be "greasy and oily[,]" their "fingernails had dirt under it[,]" and their "clothes were dirty." S.F. was not wearing socks and "her feet were black." When asked about their hygiene, the children responded that M.C.L. "bathes every other day" and the girls "bathe together maybe two or three times a week." When asked whether they had eaten that day, the children replied that the only thing they had eaten for the entire day was a bagel.

The children told Colon that they lived in Queens but had been back in New Jersey for approximately two to three nights. Sixteen-year-old M.C.L. told Colon that he was the primary caregiver for his sisters when their parents were not home. M.C.L. stated that although his mother informed him that he was enrolled in a high school in New York, he had not yet started to attend.

A-5787-14T3

M.C.L. stated that he last attended school in December of 2010 when he attended a high school in New Jersey. His high school attendance report reflected fifty-four unexcused absences during that time period.

When Colon inquired about substance abuse issues in the home, M.C.L. stated that his father F.F. was in a drug rehabilitation facility and his mother E.F. takes medications for back pain. During Colon's interview with the children, E.F. entered the room in a state of panic and admitted that F.F. "beats" her. Both C.F. and S.F., then seven and four years old respectively, admitted witnessing their father's domestic abuse of their mother. C.F. recalled an incident in which her father threw her mother against the wall. M.C.L. denied witnessing any domestic abuse but admitted hearing it.

When Colon interviewed E.F., she was "irrational" and "unfocused." She told Colon that they were in New Jersey to visit friends and gather their belongings before returning to New York. She admitted taking Oxycontin and Xanax but indicated that the medications were prescribed for back pain. At Colon's request, E.F. eventually provided her with the prescription containers. Colon noted that although the prescriptions were filled three days prior, the containers were empty. E.F. explained that the

landlord's son may have stolen her pills because he was a drug addict.

After completing the interviews, Colon conducted a home inspection. Colon described the home as a two family house. On the first floor, there was no electricity and the refrigerator had a minimal amount of food. One bedroom on the first floor was piled high with their belongings, leaving no room to walk into the room. On the second floor, the mattress, where all three children slept, was dirty, stained, smelled of urine, had no sheets, and was located on the floor. Colon described the second floor as "unsuitable for the children" and the home as "deplorable" with garbage all over the floor. Colon took photographs depicting the condition of the home, which were admitted into evidence during the hearing.

Based on the condition of the home, the appearance of the children, the excessive school absences, and the exposure to domestic violence, the Division executed an emergency removal of all three children pursuant to N.J.S.A. 9:6-8.29 to 8.30. M.C.L. was placed with his biological father and the girls were placed in an approved resource home. The Division filed an order to show cause and a protective services complaint seeking custody of the children pursuant to N.J.S.A. 9:6-8.21 to -8.73 and N.J.S.A. 30:4C-12. At the show-cause hearing conducted on March 14, 2011, the

court approved the Division's emergency removal and granted the Division continued custody of the children.

At the fact-finding hearing, E.F. produced a lease for their New York apartment dated December 11, 2010 and a utility bill dated March 8, 2011. According to E.F., she was able to enroll C.F. in school in New York with the cable bill but needed the utility bill to enroll M.C.L. F.F. testified that they began moving their belongings from the New Jersey address to the New York apartment in November 2010 so that he could be closer to his job. E.F. testified that on March 10, 2011, they had only been in New Jersey for one night to gather the rest of their belongings and to take C.F. to the doctor. However, once the children were removed from their care, they moved back to the New Jersey address to facilitate visitation with the children.

Both E.F. and F.F. attributed the excessive school absences to the girls contracting head lice. E.F. attributed the children's appearance on March 10, 2011, to the move. E.F. admitted that the children had only eaten bagels and cereal on March 10, 2011, when the Division caseworker arrived, but claimed that they were about to leave for dinner. In addition, E.F. testified that the electricity had been on the night before and was only shut off late in the day on March 10, 2011.

E.F. testified that she suffered from herniated discs and was prescribed Oxycontin for back pain. She explained that the prescription containers were empty on March 10, 2011, because she kept the pills in other locations. F.F. admitted abusing Oxycodone. He testified that from December 15 to 25, 2010, he was in an in-patient rehabilitation program for substance abuse and, thereafter, complied with the after-care requirements. F.F. testified that he suffered from Post-Traumatic Stress Disorder since 2003 when he returned from Afghanistan and left the military.

Mr. D., defendants' friend and former landlord, testified for defendants. According to Mr. D., defendants arrived at the New Jersey property on March 9, 2011, and stayed overnight. Mr. D. testified that on March 10, 2011, the police responded to the property because his son made a false report against him after they had an altercation. Upon arrival, despite Mr. D.'s assurances that defendants did not live there and that he was in the process of renovating the property, the police reported the deplorable condition of the property to the Division. Mr. D. also testified that the electricity was shut off on the first floor at 4:00 p.m. that day.

Following summation, the court issued an oral opinion from the bench, finding that the Division met its burden by a preponderance of the evidence and established that defendants

abused and neglected their children by failing to exercise a minimum degree of care in providing the children with adequate clothing, shelter, and education. The court found the conduct of both defendants to be suspect. In particular, the court noted that it was "highly unusual" that defendants were unable to provide an address or a phone number to the Division caseworker for the children when they claimed that the children were in South Jersey with a relative during the December 17, 2010 encounter. Further, the court found it "very interesting" that F.F. "was in rehab and his choice of drug was oxycodone, the very same medication that [E.F.] had for her back." The court also discredited E.F.'s testimony that the prescription containers were empty on March 10, 2011, when she was directed by the Division caseworker to produce them, because the pills were located elsewhere.

Regarding the children's schooling, the court recounted:

> We first have the testimony of the principal of the school who came in here and testified to the [c]ourt that the two children of [F.F. and E.F.] were in his school from the period of September when school started, he said in or around the 2nd or the 9th, through and until prior to the Christmas holiday. During that period of time, . . . the two girls apparently together were out of school for [twenty-five] days. Also, the children had been marked tardy six additional times[.]

The court explained that if the children "were under doctor's care for lice" or "were sick," defendants had a duty to notify the

school.  However, since the school "marked every single one of these [twenty-five] days as being unexcused[,]" defendants failed in their duty.

In addition, in connection with the move to New York, the court explained that

> [i]t is incumbent upon a parent or parents or both if there is going to be a move . . . to notify the school that the children will no longer be present there, to immediately tell the school to send whatever the school records are of these children to the next school that the children will be going to.
>
> It is also incumbent upon parents if they are moving to make sure that they have all of these documents prior to any move so that when they arrive in New York after the Christmas vacation they can then immediately put the children into the appropriate school where they live.  Apparently, no such request was made of the school in [New Jersey] and no such request was given to the schools in New York because by their own evidence the New York City Department of Education indicated that [E.F.] visited [the] high school registration center on February [] 8th.  That is at least one month plus one week after they had moved to New York, which means that the older boy was not only out of school for [fifty-four] absences . . . and . . . one-half of the time that he was supposed to be in school from September to December he was not in school and was not there with any excused absences and he didn't get back to school until February because neither parent . . . apparently had no interest or no understanding of how people are supposed to take children from one school to another school.

11

Regarding the children's appearance and living conditions, the court noted:

> [Mr. K.] also testified that several of the teachers had concerns, and he as the principal apparently was aware of those concerns, regarding the children's unkempt situation while in the school. He described stained clothing, dirty clothing, hair that had not been brushed and based on this he made or the school made a referral to the Division.
>
> . . . .
>
> Then we go into the March 10th [2011] referral. The agency received information that the family was "living" in a home that was filthy, garbage all over, with one bed and no utilities. [Colon] visited this house and on that day she did, in fact, find garbage all over the house and we saw pictures of that. She said the home was filthy. There was one bed there for all of the children to sleep. There were no utilities on the first floor. The children's hair was greasy, their clothes dirty and the oldest child said that the last time he was in school was before Christmas in [New Jersey]. Now, this is March 10th. So, now we have him out of school for three months.

The court noted further that the children "witnessed domestic violence between [E.F.] and [F.F.]." The court concluded that the children "were not protected, were not given clean clothes to wear, were not looked after to make sure that they were not unkempt, [and] were allowed to see and hear violence in the home[.]" The court concluded that defendants were "clearly . . . in violation of [N.J.S.A. 9:6-8.21(c)(4)]."

On appeal, E.F. argues:

POINT I.

BECAUSE THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE TRIAL COURT'S FINDING OF ABUSE AND NEGLECT, THIS COURT SHOULD REVERSE.

[A.][4] THE COURT BELOW ERRED IN FINDING A TITLE 9 VIOLATION UNDER N.J.S.A. 9:6-8.21(c)(4)(a).

1. [E.F.] DID NOT FAIL TO EXERCISE THE MINIMUM DEGREE OF CARE IN SUPPLYING CLOTHING, SHELTER OR EDUCATION.

2. THE CHILDREN WERE NOT IMPAIRED OR IN IMMINENT DANGER OF BECOMING IMPAIRED.

[B.] THE COURT BELOW ERRED BECAUSE IT ANALYZED [E.F.'s] PRESCRIPTION DRUG USE AND DOMESTIC VIOLENCE ALLEGATIONS UNDER AN INAPPLICABLE SUBSECTION OF TITLE 9.

F.F. raises the following points for our consideration:

I. THE DIVISION FAILED TO SHOW THAT [F.F.] FAILED TO "EXERCISE A MINIMUM DEGREE OF CARE" UNDER N.J.S.A. 9:6-8.21(c)(4)(b).

II. THE DIVISION FAILED TO PROVE THAT THE CHILDREN WERE AT SUBSTANTIAL RISK OF IMMINENT HARM UNDER [F.F.'s] CARE.

III. NEW JERSEY LACKED JURISDICTION OVER THIS CASE BECAUSE THE PARTIES WERE RESIDENTS OF NEW YORK.

[IV]. [F.F.] HAD THE RIGHT TO COUNSEL DURING THE ORDER TO SHOW CAUSE HEARING AND THE COURT

---

[4] We have renumbered E.F.'s sub-parts for clarity.

13

DID NOT ENSURE THAT HE UNDERSTOOD HIS FIFTH
AMENDMENT RIGHT AGAINST SELF-INCRIMINATION TO
SECURE A CLEAR WAIVER.

## II.

Our scope of review on appeal is narrow. "[F]indings by the
trial judge are considered binding on appeal when supported by
adequate, substantial and credible evidence" in the record. N.J.
Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 433
(App. Div. 2002) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins.
Co. of Am., 65 N.J. 474, 484 (1974)). We accord particular
deference to a Family Part judge's fact-findings "[b]ecause of the
Family Part's special jurisdiction and expertise in family matters
[.]" N.J. Div. of Youth & Family Servs. v. T.M., 399 N.J. Super.
453, 463 (App. Div. 2008) (citing Cesare v. Cesare, 154 N.J. 394,
413 (1998)). We recognize that the judge had "the opportunity to
make first-hand credibility judgments about the witnesses who
appear on the stand; [and had] a feel of the case that can never
be realized by a review of the cold record." N.J. Div. of Youth
& Family Servs. v. M.C. III, 201 N.J. 328, 342-43 (2010) (quoting
N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104
(2008)).

Even where there are alleged errors in the trial court's
evaluation of underlying facts, a reviewing court "will accord
deference unless the trial court's findings went so wide of the

mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (citations and internal quotations omitted). When the issue presented turns on a legal conclusion derived from the family court's factual findings, however, this court accords no deference. N.J. Div. of Youth & Family Servs. v. A.R., 419 N.J. Super. 538, 542-43 (App. Div. 2011).

Abuse and neglect cases are fact sensitive and "[e]ach case requires careful, individual scrutiny" as many cases are "idiosyncratic." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 33 (2011). The burden is on the Division to prove abuse or neglect by a preponderance of the "competent, material and relevant evidence[.]" N.J.S.A. 9:6-8.46(b); see also N.J. Dep't of Children & Families v. A.L., 213 N.J. 1, 22 (2013). The trial court in turn determines whether the child is abused or neglected by "the totality of the circumstances[.]" Dep't of Children & Families v. G.R., 435 N.J. Super. 392, 401 (App. Div. 2014).

N.J.S.A. 9:6-8.21(c)(4) provides that an "abused or neglected child" means an individual under the age of eighteen

> whose physical, mental, or emotional condition
> has been impaired or is in imminent danger of
> becoming impaired as the result of the failure
> of his parent or guardian . . . to exercise a
> minimum degree of care (a) in supplying the

child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court[.]

The statute does not require that the child experience actual harm, and, in the absence of actual harm, "a finding of abuse and neglect can be based on proof of imminent danger and substantial risk of harm." A.L., supra, 213 N.J. at 23 (citing N.J.S.A. 9:6-8.21(c)(4)(b)). While the Division must demonstrate "the probability of present or future harm" to the child, "the court 'need not wait to act until a child is actually irreparably impaired by parental inattention or neglect.'" N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J. Super. 13, 24 (App. Div. 2004) (quoting In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)), certif. denied, 182 N.J. 426 (2005).

A "minimum degree of care," as required by N.J.S.A. 9:6-8.21(c)(4) does not refer to merely negligent conduct, but "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." Dep't of Children & Families v. T.B., 207 N.J. 294, 299-300 (2011) (internal quotation marks and citation omitted). "Conduct is considered willful or wanton if done with

16

the knowledge that injury is likely to, or probably will, result[,]" and "can apply to situations ranging from 'slight inadvertence to malicious purpose to inflict injury.'" G.S. v. Dep't of Human Servs., 157 N.J. 161, 178 (1999) (quoting McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305 (1970)).

The essence of gross of wanton negligence is that it "implies that a person has acted with reckless disregard for the safety of others." Id. at 179. While gross negligence requires "an indifference to the consequences," Banks v. Korman Assocs., 218 N.J. Super. 370, 373 (App. Div. 1987) (internal quotation marks and citation omitted), a parent's actual intent to cause harm is not necessary. G.S., supra, 157 N.J. at 179. However, if the act or omission is intentionally done, "whether the actor actually recognizes the highly dangerous character of [his or] her conduct is irrelevant[,]" and "[k]nowledge will be imputed to the actor." Id. at 178. Such knowledge is imputed "[w]here an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences[.]" Id. at 179.

In addition, "the elements of proof are synergistically related" and "[o]ne act may be substantial or the sum of many acts may be substantial" to prove abuse or neglect. N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 329-30 (App. Div.

17

2011) (citation and internal quotation marks omitted). However, if an isolated act "appears to be aberrational[,]" labeling the parent a child abuser may be inappropriate. Dep't of Children & Families v. K.A., 413 N.J. Super. 504, 512-13 (App. Div. 2010), appeal dismissed, 208 N.J. 355 (2011). See also N.J.A.C. 3A:10-7.5(b)(3)[5] (recognizing the isolated or aberrational nature of the conduct as a mitigating factor when determining if abuse or neglect is established).

In this case, under the totality of the circumstances, we agree with the court's finding of abuse and neglect because it is supported by adequate, substantial, and credible evidence in the record. The court was unpersuaded by defendants' explanations that the school absences were attributable to two bouts of head lice, that the delay in registering the children in New York schools was caused by the school's arduous proof of residency requirements, and that they were not responsible for the condition of the home because they no longer lived there and only visited for one night. We defer to the court's factual findings and credibility assessments.

---

[5] N.J.A.C. 3A:10-7.5 was codified as N.J.A.C. 10:129-7.5 until January 3, 2017, when this regulation was re-codified in its present form. See 49 N.J.R. 98(a) (Jan. 3, 2017).

E.F. contends that while her conduct may have been "merely negligent, it was not grossly negligent or reckless" and the children "were not impaired or in imminent danger of becoming impaired." Similarly, F.F. contends that the Division failed to prove "gross negligence" or that he failed to "exercise a minimum degree of care when caring for his children." We disagree.

Then sixteen-year-old M.C.L. had fifty-four unexcused school absences from September to December 2010 and did not begin attending school in New York until March 2011. Then seven-year-old C.F. had twenty-five unexcused absences and six unexcused late attendances from September to December 2010. By statute, a parent of a child between the ages of six and sixteen years is legally required to enroll a child in school and to "cause such child regularly to attend" school. N.J.S.A. 18A:38-25. "The reference to education contained in N.J.S.A. 9:6-8.21(c)(4)(a) concerns parental encouragement to truancy of a school age child, or other interference with normal educative processes." Doe v. G.D., 146 N.J. Super. 419, 431 (App. Div. 1976), aff'd sub nom., 74 N.J. 196 (1977). We agree with the court's finding that defendants' conduct was proscribed under N.J.S.A. 9:6-8.21(c)(4)(a).

Contrary to E.F.'s contention, the Division was not required to present evidence to establish a connection between the children's excessive school absences and "falling behind in

19                                                          A-5787-14T3

school."  Indeed, "[t]he main goal of Title 9 is to protect children 'from acts or conditions which threaten their welfare.'" G.S., supra, 157 N.J. at 176 (citation omitted).  To that end, Title 9 addresses both actual harm to a child and conditions that will lead to a child's actual harm.  See N.J.S.A. 9:6-8.21(c)(4). The logical implication of E.F.'s position would be that the Division should have waited until it became apparent that M.C.L. and C.F. were unable to keep pace academically with students their age before intervening.  Such a position would prevent the Division from carrying out its statutory duty to protect children.  The Division, like the "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect."  D.M.H., supra, 161 N.J. at 383.

In addition, during the first four months of the 2010-11 school-year, both C.F. and S.F. were described by school personnel as unkempt, and wore soiled and stained clothing to school.  When the Division caseworker interviewed them on March 10, 2011, they were dirty and unkempt, and the condition of the home where the children reported staying for the past two to three nights was deplorable.  We see no reason to disturb the court's finding that, under the totality of the circumstances, such conditions posed an imminent danger to the children's welfare and supported a finding of abuse and neglect in the absence of evidence that E.F. and F.F.

lacked the financial means and awareness to improve these conditions. Unlike <u>Doe</u>, there was no evidence that the deplorable, dirty and inadequate living conditions were the "unfortunate incidents of poverty[.]" <u>Doe</u>, <u>supra</u>, 146 <u>N.J. Super.</u> at 431. Further, contrary to E.F.'s argument, the court did not partially base its finding of abuse and neglect on her abuse of prescription narcotics or the presence of domestic violence in the home. Rather, the court noted that there was a "probability" that those issues caused the proscribed conduct.

F.F. asserts that "[t]here were not enough minimum contacts between the family and the State of New Jersey" beside the overnight visitation "for the Division to take jurisdiction." F.F. continues that "the finding of abuse and neglect, based as it was upon an improper assertions of jurisdiction over this family, should be reversed." We disagree.

"It is well established that personal jurisdiction may be specific or general, and the measure of minimum contacts required as a predicate for a valid decretal exercise depends on which type of jurisdiction is asserted." <u>N.J. Div. of Youth & Family Servs. v. M.Y.J.P.</u>, 360 <u>N.J. Super.</u> 426, 459 (App. Div.), <u>certif. denied</u>, 177 <u>N.J.</u> 575 (2003), <u>cert. denied</u>, 540 <u>U.S.</u> 1162, 124 <u>S. Ct.</u> 1176, 157 <u>L. Ed.</u> 2d 1207 (2004) (citation omitted).

> A court's jurisdiction is specific if the cause of action arises directly out of a defendant's contacts with the forum state. A court's jurisdiction is general if the cause of action is not related directly to the defendant's contacts with the forum state, but is instead based on the defendant's continuous and systematic activities in the forum. . . .
>
> In the context of specific jurisdiction, whether the defendant's contacts were sufficient is determined on a case-by-case basis and depends on the relationship among the defendant, the forum, and the litigation. The minimum contacts requirement is satisfied so long as the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff. This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, and that [he] could reasonably anticipate being haled into court there. An intentional act calculated to create an actionable event in a forum state will give that state jurisdiction over the actor.
>
> [Id. at 459-60 (internal quotation marks and citations omitted).]

Here, F.F. purposefully availed himself of this forum in a manner sufficient to satisfy the "minimum contacts" requirements. New Jersey had personal jurisdiction over the family because from September to December 2010, the family resided in New Jersey and the children attended school in New Jersey. On March 10, 2011, when the Division received another referral involving the family, the family was located at the same New Jersey address. Moreover,

the appearance of the children and the condition of the home allowed New Jersey to assume temporary emergency jurisdiction "to protect the child[ren] because the child[ren] . . . [were] subjected to or threatened with mistreatment or abuse." N.J.S.A. 2A:34-68(a).

F.F. also argues that he "was prejudiced by not [being] assigned counsel much sooner in the proceeding." At the March 14, 2011 show-cause hearing, the court explained to F.F. that he had "a right to an attorney at this stage of the case and every other stage as well." However, given the emergent nature of the hearing, there was "only one public defender available . . . on such short notice" and she was representing E.F. The court advised F.F. that he could either obtain private counsel or apply for representation by the Office of the Public Defender, and directed F.F. to complete the application before leaving the courtroom. The court also permitted F.F. to cross-examine the Division's witness and introduce mitigating evidence. F.F. was later assigned an attorney from the Office of the Public Defender who represented him at the critical fact-finding hearing.

F.F. claims that the lack of representation at the March 14, 2011 hearing caused him to incriminate himself by admitting that he had previously committed domestic violence against E.F. and underwent alcohol rehabilitation as a result. According to F.F.,

23                                                    A-5787-14T3

those admissions were used against him particularly at the fact-finding hearing. Because this claim was not raised at the trial level, we review it for plain error. R. 2:10-2.

Our Supreme Court has confirmed that "parents charged with abuse or neglect of their children have a constitutional right to counsel." N.J. Div. of Youth & Family Servs. v. E.B., 137 N.J. 180, 186 (1994). Anticipating the likelihood that a parent may be unable to secure counsel on such short notice, the Legislature provided parents in such actions with the following rights:

> The court shall advise the parent or guardian of his right to have an adjournment to retain counsel and consult with him. The court shall advise the respondent that if he is indigent, he may apply for an attorney through the Office of the Public Defender. In cases where the parent or guardian applies for an attorney through the Office of the Public Defender, the court may adjourn the case for a reasonable period of time for the parent or guardian to secure counsel; however, the adjournment shall not preclude the court from granting temporary relief as appropriate under the law.
>
> [N.J.S.A. 9:6-8.43(a).]

In N.J. Div. of Youth & Family Servs. v. H.P., 424 N.J. Super. 210, 222-23 (App. Div. 2011), we held that the trial court's failure to comply with N.J.S.A. 9:6-8.43(a) rendered the proceedings "fatally deficient[.]" However, the parent's "consent to the manner in which the later fact finding occurred was rendered

with the advice of counsel" and thereby "constituted a waiver of his right to complain of that earlier deprivation." Ibid.

Here, although the judge proceeded with the show-cause hearing and did not advise defendant of his right to have an adjournment in order to obtain counsel, we are satisfied that the deficient manner in which the matter proceeded on March 14, 2011, "is no longer of any relevance" and did not prejudice defendant in the ultimate fact-finding hearing. Id. at 222. F.F. appealed only the order memorializing the later finding of abuse and neglect. His consent to the manner in which the later fact-finding hearing was conducted constituted a waiver of his right to complain of the earlier deprivation.

Further, the judge who conducted the fact-finding hearing was a different judge from the judge who conducted the show-cause hearing. At the fact-finding hearing, evidence of F.F.'s domestic abuse of E.F. was elicited independently through the caseworker's interviews of the children and E.F. Moreover, the finding of abuse and neglect was not premised on the children's exposure to domestic violence in the home. Consequently, the proceedings were not so defective as to constitute plain error and F.F. was not prejudiced by his earlier admissions to domestic abuse.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5787-14T3