**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1035-20

IN THE MATTER OF D.L.B.

_____

<div style="border:1px solid">

**APPROVED FOR PUBLICATION**

**July 14, 2021**

**APPELLATE DIVISION**

</div>

Submitted May 5, 2021 – Decided July 14, 2021

Before Judges Ostrer, Vernoia and Enright.

On appeal from the Superior Court of New Jersey,
Law Division, Atlantic County, Petition No. 0119-
XTR-2020-000001.

Damon G. Tyner, Atlantic County Prosecutor, attorney
for appellant (John J. Santoliquido, Assistant
Prosecutor, of counsel and on the brief).

Law Offices of Jef Henninger, attorneys for
respondent (Christopher B. Caserio, on the brief).

The opinion of the court was delivered by

OSTRER, P.J.A.D.

The Extreme Risk Protective Order Act of 2018 (the Act), New Jersey's

"red flag law," empowers a court to remove firearms from a person who "poses

a significant danger of bodily injury to . . . self or others" by possessing them.

N.J.S.A. 2C:58-24(b).  In this case, the Law Division, after a plenary hearing,

denied a law enforcement officer's petition for a final extreme risk protective

order (FERPO) that would have compelled D.L.B. to surrender her firearms. The State contends on appeal that it showed by a preponderance of the evidence that D.L.B. posed the requisite danger to self or others. N.J.S.A. 2C:58-24(b). Because the trial court did not admit critical evidence, did not require or ensure the State presented information and evidence upon which it relied in support of its petition, and did not make essential findings of fact, we reverse and remand for further proceedings.

I.

We first summarize the law at the center of this appeal. New Jersey, like many states, adopted a "red flag law" to permit family members and others to seek emergent orders to remove firearms from a person who poses a danger to self or others because of a mental health crisis or instability. See Response of the Supreme Court Criminal Practice Committee to Proposed Rule 3:5B "Extreme Risk Protective Orders" 1 (May 28, 2019) (Committee Report) (noting that the law was "designed to 'provide a kind of early warning system to keep mentally imbalanced individuals from becoming the next mass shooter'" (quoting Hearing Before S. Law & Pub. Safety Comm., S. 2259 (April 16, 2018))).[1] However, the law is not limited to that. It permits the

_____

[1] See also Commentary for Extreme Risk Protection Order Model Legislation, U.S. Department of Justice (June 7, 2021) https://www.justice.gov/doj/

emergent removal of weapons from any person who poses a danger to self or others. That may include a person contemplating an act of domestic violence or an act of terrorism.[2] The Act supplements other statutory mechanisms for removing firearms from persons who legally possess them. See, e.g., N.J.S.A. 2C:58-3(f) (providing for revocation of firearm purchaser identification card if person no longer qualifies).

New Jersey's law creates a two-stage process for issuing temporary and final orders to remove a person's firearms and ammunition, firearms purchaser identification card, handgun purchase permit, and handgun carry permit. N.J.S.A. 2C:58-23 (authorizing TERPO); N.J.S.A. 2C:58-24 (authorizing FERPO). The court first decides, based on an ex parte documentary record, if it will issue a temporary order to remove firearms. See N.J.S.A. 2C:58-23.

_____

reducing-gun-violence/commentary-extreme-risk-protection-order-model-legislation (noting that under red flag laws, orders to remove firearms "may be sought . . . by family members or others concerned that an individual who is suicidal or otherwise in crisis will use a firearm to seriously injure or kill himself or herself or another person").

[2] For example, the State Department of Homeland Security petitioned for a FERPO after referencing the respondent's "online Anti-Semitism, contact with the Pittsburgh synagogue shooter before the mass shooting, [and] [his] beliefs that 'force or violence is necessary to realign society.'" See Greco v. Grewal, 2020 WL 7334194 (D.N.J. Dec. 11, 2020) (dismissing the respondent's constitutional challenge to the Act). We cite this case not as a precedent, see R. 1:36-3, but as factual evidence of how the Attorney General has applied the Act, see Barnes v. Sherrer, 401 N.J. Super. 172, 176 (App. Div. 2008) (citing unpublished opinion for factual context).

Then, after a plenary hearing, the court decides if it will issue a final order to remove firearms indefinitely. See N.J.S.A. 2C:58-24. The Act is loosely modeled on the process for obtaining temporary and final domestic violence restraining orders. See Administrative Directive #19-19: Guidelines for Extreme Risk Protective Orders (August 12, 2019).

Administrative Directive #19-19 and an Attorney General Directive discuss the Act and its background at length. See Attorney General, Law Enforcement Directive No. 2019-2 (Aug. 15, 2019) (AG Directive). Administrative Directive #19-19 (AOC Directive) summarizes the Act and promulgates Guidelines (AOC Guidelines or Guideline) that prescribe the process for obtaining orders under the Act. The AOC Directive also promulgates various forms for litigants and the courts. Because the AOC Directive implements the Court's constitutional power to promulgate rules governing practice and procedure and administration of the courts, the AOC Guidelines have "the force of law." See State v. Morales, 390 N.J. Super. 470, 472 (App. Div. 2007) (discussing court directives generally). As such, a trial court is required to comply with the requirements of the directive and the AOC guidelines. The AG Directive prescribes in detail prosecutors' and law enforcement's role in carrying out and enforcing the Act. "Attorney General directives relating to the administration of law enforcement have the 'force of

law.'"  In re Attorney General Law Enforcement Directive Nos. 2020-5 and 2020-6, ___ N.J. ___, ___ (June 7, 2021) (slip op. at 27) (quoting N. Jersey Media Grp., Inc. v. Twp. of Lyndhurst, 229 N.J. 541, 565 (2017)).

A family or household member or a law enforcement officer may petition the court for an order by "alleging that the respondent poses a significant danger of bodily injury to self or others by having custody or control of, owning, possessing, purchasing or receiving a firearm."  N.J.S.A. 2C:58-23(a); N.J.S.A. 2C:58-21 (defining "petitioner" to mean "family or household member or law enforcement officer").  Persons who do not qualify as a "family or household member" must convince law enforcement to file a petition based on the evidence those persons present.  See AG Directive § 3.5 (stating an officer "shall file a petition for a TERPO" if the non-family or non-household member provides information that gives the officer "probable cause to believe that the respondent poses an immediate and present danger of causing bodily injury to self or others" by possessing a firearm).  If an officer only has "good cause," then that officer may still choose to file for a TERPO. Ibid.  The Act sets separate procedures for petitions filed against law enforcement officers.  See N.J.S.A. 2C:58-23(l); AG Directive § 5.

A-1035-20

The petition shall include an affidavit presenting the factual grounds for the relief and shall provide available information about the respondent's firearms and ammunition. N.J.S.A. 2C:58-23(b); see also Guideline 2(e).

Before deciding to issue a TERPO or FERPO, the statute requires a court to consider eight factors – whether the respondent:

> (1) has any history of threats or acts of violence by the respondent directed toward self or others;
>
> (2) has any history of use, attempted use, or threatened use of physical force by the respondent against another person;
>
> (3) is the subject of a temporary or final restraining order or has violated a temporary or final restraining order issued pursuant to the "Prevention of Domestic Violence Act of 1991," . . . ;
>
> (4) is the subject of a temporary or final protective order or has violated a temporary or final protective order issued pursuant to the "Sexual Assault Survivor Protection Act of 2015," . . . ;
>
> (5) has any prior arrests, pending charges, or convictions for a violent indictable crime or disorderly persons offense, stalking offense pursuant to section 1 of . . . (C.2C:12-10), or domestic violence offense enumerated in section 3 of . . . (C.2C:25-19);
>
> (6) has any prior arrests, pending charges, or convictions for any offense involving cruelty to animals or any history of acts involving cruelty to animals;
>
> (7) has any history of drug or alcohol abuse and recovery from this abuse; or

6

(8) has recently acquired a firearm, ammunition, or other deadly weapon.

[N.J.S.A. 2C:58-23(f).]

Guideline 3(d) requires a court to consider three additional factors, based on the Act's statement that the eight factors comprise a non-exclusive list, N.J.S.A. 2C:58-23(f), and the requirement that courts consider "any other relevant evidence" in deciding if it will issue a FERPO, N.J.S.A. 2C:58-24. See AOC Directive at 4-5 (discussing additional factors incorporated in AOC Guidelines). Those three factors pertain to whether the respondent:

(9) has recklessly used, displayed, or brandished a firearm;

(10) has an existing or previous extreme risk protective order issued against him or her; and

(11) has previously violated an extreme risk protective order issued against him or her.

[Guideline 3(d).]

Only if a court finds at least one of the eleven "behavioral" factors, then it "may consider," Guideline 3(d) (regarding TERPO), Guideline 5(d) (regarding FERPO), four additional factors pertaining to a person's mental health – whether the respondent:

(12) has any prior involuntary commitment in a hospital or treatment facility for persons with psychiatric disabilities;

(13) has received or is receiving mental health treatment;

(14) has complied or has failed to comply with any mental health treatment; and

(15) has received a diagnosis of a mental health disorder.

[Guideline 3(d).]

At both the TERPO and FERPO hearings, the county prosecutor (or his or her designee) shall produce "any available evidence," including that related to the eight statutory factors. See N.J.S.A. 2C:58-23(f) (evidence for TERPO); N.J.S.A. 2C:58-24(b) (evidence for FERPO). Also, the county prosecutor or designee "shall," if a law enforcement officer is the petitioner, "produce for the court's consideration any statements or reports pertaining to the" fifteen factors "upon which the officer relies in the petition" and, if the petitioner is a "family or household member, the county prosecutor or designee shall produce . . . any readily available information or evidence" pertinent to the factors. Guideline 3(e) (regarding TERPO); see also Guideline 5(e) (stating that the county prosecutor shall produce the 3(e) information at a FERPO hearing). In addition, at a FERPO hearing, the prosecutor "shall produce . . . information obtained through sources including the execution of any search warrant and any additional information obtained through the performance of its responsibilities" under the Act. Guideline 5(e).

A-1035-20

A finding of one or more of the factors may not be enough to support the issuance of a TERPO. The judge "shall issue" the TERPO only "if the court finds good cause to believe that the respondent poses an immediate and present danger of causing bodily injury to the respondent or others by" possessing a firearm. N.J.S.A. 2C:58-23(e); see also Guideline 4(a). The court may grant a TERPO ex parte; the court may rely only on the petitioner's affidavit, or the court may examine under oath the petitioner and any witness the petitioner presents. N.J.S.A. 2C:58-23(d); Guideline 3(c).

And, consistent with State v. Hemenway, 239 N.J. 111, 136 (2019), the court "shall" also issue a search warrant upon a showing of probable cause, although the Act provides that a search warrant "shall" issue upon a lesser showing of good cause. Compare AG Directive at § 3.3, AOC Directive at 6, Guideline 4(e), and Guideline 6(d) (requiring probable cause), with N.J.S.A. 2C:58-26(b) (requiring search warrant with TERPO) and N.J.S.A. 2C:58-23(e) (requiring only good cause for TERPO); see also Committee Report at 29-33 (discussing Act's search warrant provisions).

The AOC Guidelines provide that the search warrant shall encompass firearms and ammunition the "respondent possesses or owns at [the] specified location." See Guideline 4(e), Guideline 6(d). In so doing, the AOC Guidelines evidently narrow the scope of the warrants contemplated by the

Act, which refers to warrants to search for firearms or ammunition "in the custody or control of . . . a respondent" as well as those "owned, or possessed by a respondent." N.J.S.A. 2C:58-26(c). However, the AG Directive commands law enforcement officers executing a search warrant to "seize all firearms and ammunition within the possession, custody, or control of the respondent," and "[s]uch firearms include any that the respondent could access or possess." AG Directive § 6.4. Citing N.J.S.A. 2C:58-26(e), the Directive adds that if the law enforcement agency seizes firearms or ammunition of lawful owners other than the respondent, then the agency shall return them once it determines ownership. AG Directive § 6.4.[3]

Within ten days after the petition's filing, the Superior Court must hold a plenary hearing to decide if it will issue a FERPO. N.J.S.A. 2C:58-24; Guideline 5(a). Importantly, "[t]he rules governing admissibility of evidence at trial shall not apply to the presentation and consideration of information at the [FERPO] hearing." Guideline 5(c). Thus, notwithstanding hearsay rules, the court "may consider an affidavit and documents submitted in support of the petition, and may consider any information provided by the county prosecutor

---

[3] N.J.S.A. 2C:58-26(e) states: "If a person other than the respondent claims title to any firearm or ammunition surrendered pursuant to this section, and the law enforcement agency determines that the person is the lawful owner of the firearm or ammunition, the firearm or ammunition shall be returned to that person."

or designee." Ibid. Presumably, the court must follow the caveat on using hearsay at gun permit hearings: an order "cannot be based upon hearsay alone" and "there must be a residuum of legal and competent evidence in the record to support" the court's order. See Weston v. State, 60 N.J. 36, 51 (1972) (discussing admissibility of hearsay in firearms purchaser identification card hearings); In re Osworth, 365 N.J. Super. 72, 78 (App. Div. 2003). As at the TERPO hearing, "the court may examine under oath the petitioner and any witnesses the petitioner may produce." Guideline 5(c).[4] The respondent may testify, present witnesses, cross-examine witnesses, and "submit documents." Ibid.

The court shall issue the FERPO order if it finds "by a preponderance of the evidence at the hearing that the respondent poses a significant danger of bodily injury to the respondent's self or others" by possessing a firearm. N.J.S.A. 2C:58-24(b). "The court shall place on the record the reasons supporting its decision to grant or deny the order." Guideline 6(a); see also R. 1:7-4(a). The FERPO bars the respondent from possessing, and requires the

---

[4] The Guidelines import the statutory provision that a court may examine under oath the petitioner and witnesses at the TERPO hearing, although there is no comparable statutory provision pertaining to the FERPO hearing. Presumably, the court may also examine the respondent under oath. See N.J.R.E. 614; State v. Ross, 229 N.J. 389, 408 (2017) (stating that the Evidence Rules "explicitly permit trial judges to interrogate witnesses").

respondent to surrender, any firearms, ammunition, firearm purchaser identification card, handgun purchase permit, and handgun carry permit. Guideline 6(b); see also N.J.S.A. 2C:58-24(d).  The court "shall" also issue a search warrant if "probable cause exists to believe" that "the respondent owns or possesses any firearms or ammunition" and, by doing so, "poses a significant danger of bodily injury to self or others," and "such firearms or ammunition are presently at a specifically described location."  Guideline 6(d).

A respondent may ask the court at any time to terminate the order, and the court "shall consider" all fifteen factors including "whether the respondent has received, or is receiving, mental health treatment."  Guideline 7; see also N.J.S.A. 2C:58-25(c).  Until the court issues a further order, the FERPO remains in effect.  Guideline 6(c).

Records relating to TERPO and FERPO proceedings are confidential and shall not be disclosed to persons other than respondent except for good cause shown.  Guideline 8(a); AOC Directive at 9.[5]  Likewise, a central registry of TERPO and FERPO orders is confidential.  AOC Directive at 9; N.J.S.A. 2C:58-30.

---

[5] We refer to D.L.B. by her initials to comply with this Guideline.

II.

Turning to the case at hand, Pleasantville Police Detective Juan Morillo resorted to the Act after he responded to a dispute among neighbors.[6] In his petition, he stated he believed D.L.B. posed an "immediate and present danger of causing bodily injury to self or others" because she "recklessly used, displayed, or brandished a firearm." To support that conclusion, Detective Morillo made four factual allegations.

First, he asserted D.L.B. unsafely handled a handgun. The detective stated: "Respondent was recorded dancing in her driveway holding a pink framed handgun and pointing the firearm aimlessly with disregard to civilian safety. The respondent is also recorded loading and charging rounds into the chamber." The petition identified the manufacturer, model, and serial number of the 9 mm black and pink handgun.

Second, Detective Morillo stated that D.L.B.'s son texted D.L.B. to "advise[] that he was afraid to visit her after watching her in the video."

Third, the detective stated that D.L.B. "admitted to traveling with her firearm inside her vehicle for protection." Detective Morillo noted in the

---

[6] Morillo was a patrol officer at the time, but was a detective when he testified at the FERPO hearing. Therefore, we refer to him by his new rank.

A-1035-20

petition – evidently in error – that D.L.B. did not have a permit to purchase a handgun.[7]

Fourth, Detective Morillo stated that D.L.B.'s fiancé owned a .40 caliber handgun, which was described in detail and is registered to the same address as D.L.B.'s, but he alleged that D.L.B. also "possesse[d]" that weapon.

In addition, the detective alleged that a complaining neighbor was "afraid of [D.L.B.] having a handgun."

The detective also stated that his allegations were supported by three documents: his police report, his "body worn camera footage with supporting statements," and a video-recording made by D.L.B.'s neighbor of her actions that was subsequently posted to Facebook.

The municipal court granted the TERPO in an ex parte proceeding. We note there are significant ambiguities in the court's order. The form states that during the ex parte hearing, the municipal court considered the petition, "and/or" Detective Morillo's testimony, "and/or" the three documents. Therefore, it is unclear which of the three the court actually relied on to find facts supporting the petition. See State v. Gonzalez, 444 N.J. Super. 62, 71 (App. Div.) (reversing criminal conviction after jury instructions repeatedly

---

[7] Detective Morillo testified at the FERPO hearing that D.L.B. did possess a purchase permit. The petition also stated that D.L.B. possessed a firearms purchaser identification card, but not a permit to carry a handgun.

used term "and/or"; noting the "imprecision" of the term; and collecting cases in support of the term's "well-documented" criticism), <u>certif. denied</u>, 226 N.J. 209 (2016) (limiting "[t]he criticism of the use of 'and/or'" in jury instruction "to the circumstances" of that case).

Further, the order states the court considered both Detective Morillo's allegation of reckless brandishment, with the four accompanying facts, and, as "[a]ny other relevant factor," Detective Morillo's allegation that D.L.B.'s neighbor feared her having a gun. The form then states that the court "found at least one of the factors listed above" without stating which one. A blank space after the words "the court also having considered" indicates the court did not find any of the four mental health factors.

Although the form order does not clearly identify the evidence the municipal court relied on, nor the factor it found, the court concluded that the petitioner presented "good cause that [D.L.B] will pose/poses an immediate and present danger of causing bodily injury to . . . herself or others by owning, possessing, purchasing or receiving firearms and/or ammunition." The court also issued a search warrant on probable cause to search for and seize: any

A-1035-20

permits or purchaser ID cards issued to D.L.B., the black and pink handgun that she owned, and the handgun "belonging to" her fiancé.[8]

The State then sought a FERPO.[9] Detective Morillo was the county prosecutor's sole witness. He testified that he was called to D.L.B.'s address because dispatch had "advised that there was a female" – who turned out to be D.L.B. – "yelling in the middle of the street" at around 6 a.m. D.L.B.'s neighbor had called the police. When the detective arrived on the scene, another officer was already there speaking with D.L.B. and her fiancé. The detective spoke to D.L.B. for about fifteen to twenty minutes; he described her as being "agitated, upset, [and] cursing here and there." She was upset that her neighbor recorded her while she handled her firearm.

Detective Morillo asked her why she had her weapon out of the house, and "she said something along the lines that she's allowed to have it in the car

---

[8] The search warrant included a preamble stating, "The court finds that probable cause exists to believe that (1) the respondent owns or possesses firearms or ammunition <u>as described below</u>, (2) the respondent poses an immediate and present danger of bodily injury to self or others by owning or possessing any such firearms or ammunition, and (3) such firearms or ammunition are presently at the location described below"; the order then stated, "[T]his order shall serve as a warrant to search for and seize . . . the following firearm(s) and/or ammunition"; and the order then described the pink and black handgun D.L.B. owns and the handgun that her fiancé owns.

[9] The Law Division held the hearing several months after the TERPO issued. The judge attributed the delay to the Covid-19-related court closures, and D.L.B.'s adjournment requests to obtain counsel.

as long as the clip is not together, and that she was carrying it for protection in her car."  The detective later amplified that D.L.B. said "[t]hat she used it for protection, and she had it in her car.  She was just moving it from the car to the house."  Although the detective did not ask D.L.B. why she needed a gun for protection, she did say "that she was threatened by her neighbors."

The detective testified that he was informed that D.L.B.'s son "was concerned" regarding his mother's possession of the firearm.  As D.L.B. later elaborated, the son was an adult who did not live with her.  However, the detective did not provide the basis of the son's concern because the prosecutor twice withdrew his related question after respondent's counsel raised a hearsay objection – notwithstanding Guideline 5(c).[10]

The detective then spoke with the neighbor who had called the police – but was not the person who actually recorded D.L.B. the day before.  That neighbor showed him a ten to fifteen second video of D.L.B. in her driveway with her gun.  Detective Morillo "saw [D.L.B.] handling the weapon carelessly and pointing it up in the air and wa[]ving it to the sides as she was dancing with the weapon."

---

[10]  According to the hearing transcript, when the detective stated during cross-examination that the son said he was afraid of going to D.L.B.'s home, the prosecutor himself interposed an objection, evidently based on hearsay, which the court sustained.

A-1035-20

The detective said after he responded to the dispute among the neighbors, he was "uneasy" about what he saw in the video. He said he later found on Facebook a longer video of over two minutes that depicted D.L.B. handling her handgun. He preserved the video by recording it with his body camera. The video was played for the court.[11] It showed D.L.B. swaying rhythmically, apparently to music, while she twice removed and inserted the magazine, and pulled the hammer as she pointed the weapon to the left and right. One of the neighbors narrating the video surmised that the handgun was unloaded, noting, "Ain't nothing in it. She cocked it twice already. You would have heard the shell fall out."

After consulting with superiors about extreme risk protective orders, searching records, and conferring with the county prosecutor, the detective filed his petition eight days after he responded to D.L.B.'s home.

During cross-examination, respondent's counsel questioned the detective about statements he made on his bodycam, but neither side introduced the

---

[11] Although the video was played, no transcript of it was marked into evidence. The court did not, as Rule 1:2-2 requires, mark the video into evidence as a court's exhibit and retain it. See R. 1:2-2 (stating "[u]nless a transcript thereof is marked into evidence, a verbatim record shall also be made of the content of an audio or video tape played during the proceedings and the tape itself shall be marked into evidence as a court's exhibit and retained by the court"). However, the video is included in the record before us.

bodycam recording, and the court did not request or consider it. The prosecutor also did not present the detective's police report, which the municipal court may have considered. Respondent's counsel elicited that no one called the police the day D.L.B. was observed handling her firearm. Rather, the police were called the following day, when she confronted her neighbors after she discovered they posted the video on the internet, which she believed invaded her privacy.

Responding to the court's questioning, the detective confirmed there was no video-recording of D.L.B. yelling in the street at her neighbors, which prompted the call to police, but he did video-record his interviews on his bodycam. The court also explored the eight-day delay between the detective's response to the scene and his application for the TERPO. Although Guideline 5(c) expressly authorizes the court to examine the petitioner and any witnesses the petitioner produces, the judge expressed some reluctance in posing questions.

After stating that the municipal court had found that the respondent recklessly used, displayed or brandished a firearm, the judge asked the prosecutor if he had any evidence regarding respondent's mental health, quoting factors 12 through 15. The prosecutor said he did not.

19

D.L.B. testified that when she was video-recorded, she and her boyfriend had just returned from the gun range after discovering it was closed. She stated that she transported her gun to and from the range by storing it in a "black little thingy" in the trunk. She stated "the clip can't even be loaded" when she went to the range. She stated she took a gun safety course in order to shoot at the range before she acquired her handgun.

She acknowledged pulling the hammer of the gun back and forth a few times in the video. She stated that since she was in her own yard, she did not think she was doing anything wrong. She said she was dancing with her handgun because she was feeling happy. She said, "I really wanted to shoot my gun. I just got it. I only went to the gun range once, and it's pretty in pink, and I just didn't think I was doing anything wrong." She said the gun was not loaded and she never would have danced the way she did with a loaded gun. She acknowledged that while she danced next to her car in the driveway pulling the hammer, her fiancé was nearby cleaning the wheel rims; her twenty-one-year-old son and seven-year-old daughter were inside the house; and neighbors were close by. Asked specifically whether it was true that she told the detective that she "drive[s] around with [her] gun in [her] car for protection," D.L.B. did not respond directly, instead stating that the detective did not want to hear what she had to say.

A-1035-20

D.L.B. said that her adult son alerted her to the video after he saw it on Facebook. She believed it was "disrespectful" to post the video and her neighbors harassed her. Around 6 a.m., she walked into the street and told her neighbors she was going to complain to the police. When she did so, she learned the neighbors had called already. She contended the neighbor who took and narrated the video wanted to put her in a bad light because she had previously rejected his romantic advances. D.L.B. agreed the detective's body camera would have captured her in a very agitated state when the police arrived, but that was because her neighbor's recording her "was the last straw, and I finally popped. And I was upset . . . I was very angry." But she said she did not get her weapon or threaten them with it. D.L.B. also said that if the court denied the petition and returned her guns, she would never do something like that again, since she "learned [her] lesson."

In closing, respondent's counsel highlighted that D.L.B. was handling her handgun on her own property, nobody was injured, and the neighbors narrating the video were not fearful, but instead could be heard mocking D.L.B. and laughing at her. Additionally, the neighbors did not call the police because of what they saw; they called the police because D.L.B. allegedly was yelling in the street the following morning. And, the claim that D.L.B. was a

21

A-1035-20

danger was belied by the fact that Detective Morillo did not apply for the order until eight days after being called out to the scene.

The State highlighted D.L.B.'s statements that she did not realize, in the moment, that she was doing anything wrong. Emphasizing that the fiancé and child were nearby when she pointed the weapon, the prosecutor argued that D.L.B. did "not have a sufficient appreciation of the danger that firearms pose."

In its oral decision, the court found Detective Morillo was credible, and D.L.B. was "very straightforward" and "gave a very clear statement of . . . what happened that day." The court credited D.L.B.'s statement that the gun was not loaded when she was dancing with it. "[F]rankly, there was an indication that she had pulled the hammer, and frankly, if it had been loaded, we would have known that. This would be an entirely different case." The court characterized the case as being the "combination of a neighbor dispute, a long going neighbor dispute, and Facebook foolishness which caught Miss [B.] doing foolish things."

The court did not decide if D.L.B. "recklessly used, displayed or brandished a firearm." Evidently referring to the municipal court, the judge stated, "the [c]ourt has to be concerned that there was a finding here that there was a brandishing of a weapon." The judge continued, "I have to take into

22

consideration that it appears that it was not loaded, but it could have been different[] than that." Without referring to the preponderance-of-the-evidence standard of proof, and without deciding if D.L.B. acted "recklessly," the judge stated, "So we definitely established that there was credible and relevant evidence that there was brandishing of the weapon."

The judge noted that the prosecutor had no evidence about the "other behavioral factors [that] could also play into the [c]ourt's decision." Also, "based on [D.L.B.]'s testimony, she does not indicate or give any indication that she has any psychiatric disabilities or any mental health disorder."

The court made no findings regarding Detective Morillo's allegation that D.L.B. carried her gun in her car for protection; her adult son was afraid of his mother's gun possession; and the neighbor who complained to police (as distinct from the videographer) was afraid of D.L.B.

The court concluded "there is not an establishment here that [D.L.B.] poses a significant danger of bodily injury to herself or others by owning, possessing or purchasing or receiving a firearm." The court dissolved the TERPO and denied the request for a FERPO. The court ordered the guns

23

returned to D.L.B. and her fiancé, but stated that it would stay that aspect of its order if the State appealed.[12]

In its written order, the court stated it "does not find by a preponderance of the evidence that [D.L.B.] will pose/poses a significant danger of bodily injury to . . . herself or others by owning, possessing, purchasing or receiving firearms and/or ammunition."  The same lack of clarity in the municipal court's order plagues the Superior Court's final order.  The order notes the court "considered" the petition, "and/or" Detective Morillo's testimony (without mentioning D.L.B.'s testimony), "and/or" the three documents.  The order lists the reckless brandishment factor, and the "any other relevant factor" followed by the phrase "[h]aving found at least one of the factors listed above," but the court, in its oral decision, never found recklessness, and did not identify "any other relevant factor."  Moreover, the final written order included a search warrant to seize both D.L.B.'s and her fiancé's firearms, although they had already been seized after the TERPO.  The order did not formalize the court's oral decision to stay the return of the firearms to D.L.B. and her fiancé.

---

[12]   The judge stated, "If there is a determination to appeal, of course the weapons would not be turned over immediately."  The court directed the prosecutor to notify respondent's counsel "to let him know what the State's decision is and whether the weapons will be turned back over to the rightful owners."  Respondent's counsel has confirmed that law enforcement has retained the firearms pending appeal.

A-1035-20

The State raises one point on appeal:

POINT I

RESPONDENT'S RECKLESS HANDLING OF HER FIREARM IN HER DRIVEWAY AND HER IMPULSIVE ANIMUS TOWARD HER NEIGHBORS DEMONSTRATES THAT HER POSSESSION OF FIREARMS POSES A SIGNIFICANT RISK OF HARM TO HER FAMILY AND HER NEIGHBORS.

### III.

We are constrained to reverse and remand because the trial court did not consider all relevant evidence or make sufficient factual findings.

We acknowledge "[t]he scope of appellate review of a trial court's fact-finding function is limited." Cesare v. Cesare, 154 N.J. 394, 411 (1998). We are generally bound by trial court findings "when supported by adequate, substantial, credible evidence." Id. at 411-12. When evidence is testimonial and involves credibility questions, deference is "especially appropriate" because the trial judge is the one who has observed the witnesses first-hand. Id. at 412. An appellate court will not disturb a trial court's findings unless they "went so wide of the mark that the judge was clearly mistaken." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007).

However, a trial court must "find the facts" in its oral or written opinion, R. 1:7-4(a), and state "the reasons supporting its decision to grant or deny" the

FERPO, Guidelines 6(a). A reviewing court may "expect" that a trial court's fact-findings will adequately address the "disputed issues" among the parties. N.J. Div. of Youth & Fam. Servs. v. H.P., 424 N.J. Super. 210, 230 (App. Div. 2011). A judge's fact-finding must explain "how and why the ultimate conclusion was drawn." Ibid. "Failure to make explicit findings and clear statements of reasoning 'constitutes a disservice to the litigants, the attorneys, and the appellate court.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Curtis v. Finneran, 83 N.J. 563, 569-70 (1980)); see also J.D. v. M.D.F., 207 N.J. 458, 488 (2011) (remanding where trial court entering FRO "did not sufficiently articulate findings and conclusions consistent with the statutory standards").

In determining whether to issue the FERPO, the AOC Guidelines state that the court "shall consider" the eleven factors. Guideline 5(d). Detective Morillo's petition relied on factor 9 – whether the respondent "has recklessly used, displayed, or brandished a firearm." The court orally found there was credible evidence of brandishing but did not address whether D.L.B. acted recklessly.[13] Also, the court did not address D.L.B.'s admission that she "just

---

[13] Evidently, it is a cardinal rule of gun safety that a person handling a firearm should "always keep the muzzle pointed in a safe direction." See Firearm Safety – 10 Rules of Safe Gun Handling, Rule #1, National Sport Shooting Foundation, https://www.nssf.org/safety/rules-firearms-safety/ (last visited

got" her handgun, although factor 8 pertains to whether the respondent "has recently acquired a firearm, ammunition, or other deadly weapon."

The court also failed to address the other factual allegations in the petition. Of particular concern should have been the detective's testimony that D.L.B. stated she transported her handgun in her car for protection, and D.L.B.'s evasion of the question whether that was true. According to the petition, D.L.B. did not possess a permit to carry. Thus, transporting her handgun in her car for protection (presumably loaded or with the ammunition easily accessible) should have raised concerns both because it might indicate the potential for danger to herself or others, and because it would have been unlawful, see N.J.S.A. 2C:39-5(b)(1) (stating "[a]ny person who knowingly has in his [or her] possession any handgun . . . without first having obtained a permit to carry the same . . . is guilty of a crime of the second degree").[14]

---

June 18, 2021) (stating "[t]his is the most basic safety rule"; "[i]f everyone handled a firearm so carefully that the muzzle never pointed at something they didn't intend to shoot, there would be virtually no firearms accidents"; and "[e]ven when 'dry firing' with an unloaded gun, you should never point the gun at an unsafe target").

[14] A person does not need a carry permit to transport a handgun to the target range if properly stored, see N.J.S.A. 2C:39-6(f)(3)(b), -6(g). But, according to Detective Morillo, D.L.B. said she also carried her handgun in her car for a different purpose.

The court also made no findings regarding the son's reasons for fearing his mother's gun possession. Family members have a special role under the Act. Although the son did not initiate the petition, his concerns may have shed light on the issues at hand. The court mistakenly sustained a hearsay objection regarding testimony that D.L.B.'s son was afraid to go to his mother's home. Furthermore, the court did not address whether the neighbor was fearful of D.L.B.'s handgun possession, and why.

The court was obliged to consider the officer's bodycam recording, and his report, each highly relevant evidence. Detective Morillo cited these items as support in his petition, and the municipal court may have considered one or more of them in entering the TERPO (as noted, we cannot be sure, because of the "and/or" usage). In addition to confirming (or not) the detective's allegation about D.L.B. carrying the handgun in her car for protection, the bodycam video would have depicted D.L.B.'s demeanor. Although D.L.B. admitted she was angry, the video evidence may have placed in clearer focus D.L.B.'s temperament and her capacity for self-control.

According to the FERPO hearing transcript, the prosecutor chose not to offer the bodycam recording or police report. But Guideline 3(e), pertaining to TERPO hearings, states that the county prosecutor or designee "shall," if a law enforcement officer is the petitioner, "produce for the court's consideration any

28 <span></span>

statements or reports pertaining to the" fifteen factors "upon which the officer relies in the petition."[15]   Guideline 5(e) requires the county prosecutor to produce the same information at the FERPO hearing, plus more.  The guideline states that "[i]n addition to information referenced in Guideline 3(e), the county prosecutor or designee shall produce for the court's consideration information obtained through . . . execution of any search warrant and any additional information obtained through the performance of its responsibilities under" the Act.  Guideline 5(e); see also AG Directive § 4.4 (stating that prosecutor's obligation to produce "any statements or reports pertaining to the factors" "is true at the TERPO and FERPO hearing").  Because the AOC Directive and Guidelines have the force of law, see Morales, 390 N.J. Super. at 472, the court was responsible for requiring, and ensuring, that the State honored its production obligations under Guidelines 3(e) and 5(e).

---

[15]  We acknowledge that AG Directive § 4.4 states that "[s]tatements or reports do not include video or audio files," citing State v. Robinson, 229 N.J. 44, 71 (2017).   However, that oversimplifies the holding in Robinson, which addressed the State's obligation to disclose "[s]tatements and reports relating to the risk of flight, danger, and obstruction" before a pre-trial detention hearing. 229 N.J. at 70.  The Court expressly stated that "statements and reports" "include witness statements that are maintained only in recorded form and have not yet been reduced to writing," id. at 70-71, which would include D.L.B.'s statements to Detective Morillo that he recorded on his bodycam and were, evidently, not transcribed.

By stating that the court then "may consider" that information, Guideline 3(c) (TERPO); 5(c) (FERPO), the guideline apparently invests the court with some discretion, since the word "may" connotes a permissive, discretionary action.  See State v. S.N., 231 N.J. 497, 512 (2018) (interpreting use of "may" in the Criminal Justice Reform Act).  But, the discretion here is limited, because Guideline 5(d) states that "the court shall consider all relevant evidence," and the use of "shall" is mandatory, S.N., 231 N.J. at 512.

The underlying relevance decision, like evidentiary rulings generally, "is 'entitled to deference absent a showing of an abuse of discretion i.e., [that] there has been a clear error of judgment.'"  Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (alteration in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)).  But we owe no deference to a decision made without explanation or a decision made without considering the applicable factors.  See S.N., 231 N.J. at 515.  The court made no relevance decision at all regarding the bodycam recording, or the police report.  And, though a court may sometimes decide evidence is irrelevant sight unseen, that is not true here.  The bodycam recording of Detective Morillo interviewing D.L.B. was most certainly relevant in assessing her demeanor and self-control, and in deciding if she carried her gun in her car for protection.  Furthermore, the AOC Directive suggests that at the FERPO hearing, the Guideline 5(e) information

30

is inherently relevant. It states, "The court will consider all relevant information, <u>including</u> . . . any information provided by the county prosecutor or designee pursuant to Guideline 5(e)." AOC Directive at 8 (emphasis added).

Absent consideration of this evidence, and findings on these critical issues, the court's determination that D.L.B. did not pose a danger to self or others rested on an incomplete foundation. Therefore, we are constrained to reverse the court's order dismissing the petition, and to remand for more complete findings upon review of the relevant evidence, including all of the information the State is required to provide the court in accordance with Guidelines 3(e) and 5(e). We express no opinion on the ultimate result of the court's further fact-finding. The TERPO is reinstated pending decision on remand.[16]

Lastly, particularly when a trial judge has made credibility findings based on a mistakenly limited evidentiary record, the judge may be perceived to be committed to his or her original fact-findings despite new evidence

---

[16] Absent an application from the fiancé, we do not address whether sufficient factual and legal grounds were presented for seizing the handgun D.L.B.'s fiancé owns, but which the petition alleged, D.L.B. possessed; and whether the stay of the return of his firearm should continue pending completion of the remand proceedings. The trial court may address these questions in the first instance.

31

presented on remand; therefore, it is appropriate for us to assign the case to a different trial judge.  See R.L. v. Voytac, 199 N.J. 285, 306 (2009) (finding it was "appropriate" to assign remanded matter to a different trial judge "[b]ecause the trial court previously made credibility findings"); Penbara v. Straczynski, 347 N.J. Super. 155, 163 (App. Div. 2002) (requiring a different judge to hear retried case where trial judge "may have a commitment to her original perception of the [witness's] credibility," which was based on an erroneously limited evidentiary record).

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION